20    41
30   584
32   259

[No. 1978.]

U. P. HELM v. THE STATE.

1. PRACTICE — ACCOMPLICE TESTIMONY.— Under the law of this State, persons charged as principals, accomplices or accessories, whether by the same or separate indictments, cannot be introduced as witnesses for one another, but they may claim a severance, and if any one or more be acquitted, or the prosecution be dismissed, they may testify in behalf of the others.

2. SAME — NEW TRIAL — NEWLY-DISCOVERED EVIDENCE.— If one charged as an accomplice or accessory be acquitted, or the prosecution against him be dismissed after his principal has been tried and convicted, a new trial will be granted the latter to obtain the testimony of the former, if it appears that the new evidence is legal, true and competent, and is material to his defense,

Such testimony is treated as, but is not, technically, newly-discovered evidence. Note a case to which the rule applies, and see the statement of the case for the testimony of the discharged accomplice *held* to demand the award of a new trial.

Appeal from the District Court of Comanche. Tried below before the Hon. T. B. Wheeler.

The indictment in this case charged the appellant with the murder of John Harris, in Comanche county, Texas, on the 14th day of October, 1884. His trial resulted in his conviction of murder in the second degree, and his punishment was affixed at a term of seven years in the penitentiary.

William Barnes was the first witness for the State. He testified that the deceased, John Harris, was killed on Tuesday, October 14, 1884. Tom Rolla was in witness's hardware store, in the town of Comanche, on the Saturday previous to the killing. He wanted to buy a pistol of a pattern witness did not have. Defendant was not with Rolla.

F. M. McDermott testified, for the State, that late on the evening of Monday, October 13, 1884, defendant and Tom Rolla came into his hardware store in Comanche, Texas, to purchase a forty-five caliber Colt's revolver. Witness had none of that size. They then proposed to take and pay for a forty-four caliber if witness would order a forty-five and exchange. Witness declined and they left. From their actions and anxiety to purchase witness became satisfied that something was wrong.

James Hill testified that defendant and Rolla came into the store where witness was employed, on Monday evening before Harris was killed, and wanted to exchange a small for a large pistol. The trade was declined.

B. A. Chilton testified, for the State, that defendant and Rolla came into his store in Comanche on Monday evening. The defendant purchased some buck shot. While witness was weighing the shot he asked defendant if he was going to kill a deer. Defendant looked at Rolla, smiled, and said: "I think, if I have good luck, I will get a buck in the morning." This was on the evening before the homicide.

F. E. Fannin was the next witness for the State. He testified that the defendant and a man whom he had since learned was named Rolla, on horseback, passed his house on the morning before the day of the killing, going towards Comanche. They passed again, going back, late that evening, somewhat under the influence of

liquor. As they passed the witness, a little log hut intervening, the witness heard Rolla say to the defendant: "The next time you make a pass at him, I don't want you to make a flash of it like you did before." Defendant replied: "No, the next pass I make at him, I will get him." Witness heard no more, and had no idea of whom they were talking.

Will De Witt testified, for the State, that the defendant and Rolla were in his saloon together on the day before the killing of John Harris, and took a drink. Defendant placed a package on witness's counter from which some buck shot escaped. As witness stooped to pick them up, he asked defendant if he was going to kill a deer, and he replied that he was. From the manner in which the defendant and Rolla looked at the witness, witness thought they were talking about him, and asked them what they said. Defendant replied: "You will know soon enough."

Doctor C. F. Paine, testifying for the State, said that the death of the deceased was occasioned by buck shot wounds, six in number, which entered the body on the right side. When the witness saw it, the body lay on the ground, about one hundred and fifty yards from the defendant's house, which was situated about three miles north of the town of Comanche. It lay rather on the right side, facing south, the head west, and the feet, somewhat drawn up, east. The right arm was somewhat drawn up under the body, and the body was resting on some bushes. Five of the buck shot entered the body a little to the rear of the right side, scattering towards the back, over a space about two inches in extent. The sixth shot passed in just over the hip bone. One or two of the shot passed out of the body, about two inches from and a little above the navel. An ax lay with the handle either under or across the feet of the deceased.

Mrs. Elizabeth Farmer, the aunt of the deceased, was the next witness for the State. She testified that the deceased lived at her house, and made a crop on her place in 1884. The defendant lived about a quarter of a mile from witness's house. One morning in August, 1884, while witness and deceased were seated at breakfast in witness's house, the defendant came in and asked deceased: "John, did you kill my sow?" Witness did not catch deceased's reply, but heard defendant say in answer to something said by deceased: "The law does not compel me to keep my hogs up." Deceased then, with the fist of one hand, struck the palm of the other angrily and said to defendant: "Don't you say hogs any more to me." Witness caught the deceased's eye, shook her head, and said to him: "John! John! not in the house." The defendant then

passed into the room into which witness had gone, and said to the witness that he would have deceased pay for his hog if the law would make him do it. He then asked if witness was going to keep deceased at her place another year; and said that if she did, he was going to pull his fence loose from the witness's; that he could not have his hogs killed up recklessly.

The deceased came home early on the evening before he was killed. Witness told him that the defendant was going to pull his fence loose from hers the next day, and asked him if he could get hands and fix her fence. Deceased replied that he would repair the witness's fence, but could not do it next day. Breakfast was served at witness's house about day-light on the next day. After he had eaten breakfast, deceased said that he would first take his oxen off and would then cut some brush and close up the gap in the fence until he could fix it permanently. He then went to the woodpile, took up his ax, hung the blade across his right arm, which allowed the handle to pass down his body. Witness saw no more of him alive. The removal of the defendant's fence, as he threatened, would have exposed the witness's pasture.

Jesse McGuire testified, for the State, that he went to the house of the defendant on the morning of the homicide, to assist him in removing and repairing some fence. Tom Rolla got in a wagon to drive it to the place where the work was to be done. Witness followed on foot. When Rolla and witness started, the defendant went back to the house and got his shot-gun, and followed behind the wagon with the witness. They let down a gap when they got to the fence which let them into a two-acre inclosure. Some hogs were in that inclosure, and Rolla said to defendant: "Polk, you had better drive those hogs out." Defendant started in pursuit of the hogs, and Rolla drove on, the witness following the wagon on foot. When the wagon had traveled some seventy-five yards, and just as it was stopping, witness heard a voice call: "What are you doing here, you son-of-a-b—h?" and immediately a gun fired. Witness did not recognize the voice. Witness advised Rolla to go to the point from which it was evident the gun was fired, and see what had occurred. Witness and Rolla went together, running the larger part of the distance. Witness saw the defendant, when he reached a point within ten steps of him, standing in some bushes, about half bent, his gun pointing over the fence in the direction where the deceased was found to be lying. Rolla asked: "What is the matter here?" Defendant replied: "The d—d son-of-a-b—h started to throw his ax at me, and I shot him." The parties stepped over the fence to go to the body, when

the women at the defendant's house began screaming, and Rolla said to defendant: "You had better go and see about that woman of yours." Defendant started to his house immediately.

The deceased was found lying on the ground, his body lying on and being partially supported by some small bushes. He died within a few minutes, without having uttered a word. Witness then went to the house of Mrs. Farmer to tell her of her nephew's death; thence he went home for his wife to take her to defendant's wife, and then returned to the body. Several parties had arrived meanwhile. Sheriff Cox, Doctor Paine, A. T. Ritchie, Bailey Nabors, M. V. Fleming and others came shortly afterwards. Witness did not touch the body. Doctor Paine examined the body.

Cross-examined, the witness stated that his agreement to help repair and remove the fence was made on the evening before, and for the day of the homicide. The fence to be removed belonged to the defendant, but formed part of Mrs. Farmer's inclosure, and, when removed, would expose Mrs. Farmer's inclosure to depredation by stock. The distance from the point where the defendant started in pursuit of the hogs to the gap in the fence where the shooting occurred was about seventy-five yards. From the time the defendant left the party, going after the hogs, until witness heard the voice and the report of the gun, the defendant could not have gone more than seventy-five yards. Witness and Rolla had traveled only that distance in that time with the wagon. The defendant, when joined by witness after the shot was fired, was standing at the crossing of the rails that formed the gap in the fence. The posts standing at either end were about eight feet apart, and the defendant stood about three feet north of the south post. Those posts were about as high as an ordinary man, and were about six inches in diameter. The growth about the gap was about two feet high, and was too scattering for several feet for a man to secrete himself immediately about the gap. The gap was about seventy-five yards from the fence which was to be moved. A fence ran between the two points north and south. The growth east of the fence was somewhat heavier than that on the west. A path ran with the fence on the east side until it reached a point about forty yards from the gap, where it forked, the right hand going to the gap, and the left leaving the gap about forty steps to the right. The witness traversed the path east of the fence, and about half way in it saw where the tracks of a man had come nearer together, as making short steps, than anywhere else on the path, and here he saw an indentation in the ground which appeared to have been made by the blade of an

ax. That point was about opposite where Rolla, defendant and witness entered the inclosure. From this point a man, by looking carefully, could see another man entering the inclosure where the wagon did. Witness followed those steps up the path to the fork, where they took the left prong. There were no tracks to be seen on the right hand path. The tracks did not follow the path through, but left it about twenty steps from the fork. The body of the deceased lay between the two paths. There were no bushes at that point large enough to hide a man from another man at the gap, where the defendant stood. An ax lay at the feet of the deceased. A man standing at the gap could not see a man coming up the left hand path, but could see a man coming up the right hand path for some thirty or forty steps beyond the fork. The growth about the body was insufficient to hide a man from view of another at the gap. Deceased was on defendant's land when killed. Deceased's reputation in the neighborhood was that of a violent and dangerous character, and a man likely to execute any threat he would make.

J. A. Holman, county surveyor of Comanche county, testified for the State that he made the plat in evidence in February, 1885. There were some small bushes, principally sumac, about the gap. They were about two-feet high, but had been browsed off by stock. The ground was much tramped over and the trails were dim. There were signs of trails along the fence, going north. The fence, from the gap at which the fatal shot was said to have been fired, south to Mrs. Farmer's wire fence, had been removed when witness made the plat. The gap described was over the line on defendant's land, about seventy-five yards, and was about the same distance from the fence which was removed. The point where the deceased was said to have been when shot was north of west of the gap, about twenty-eight feet.

A. T. Ritchie testified, for the State, that he was one of the jury of inquest over Harris's body. Jesse Harris pointed out to witness, as the place occupied by defendant when he fired the fatal shot, a place which was a little north of the south post in the gap. Sumac bushes grew about the gap, both on the outside and inside, and some of them were as high as a man's head. Witness noticed some freshly broken twigs, with unwithered leaves. Witness found tracks in the trail on the outside of the fence, coming from the direction of Mrs. Farmer's house, and going in a northerly direction. Witness could find no tracks nearer the body than twenty-five or thirty feet. The trail following the fence on the west side was rather dim. It forked about twenty steps from Mrs. Farmer's wire fence at the

point where it joined the defendant's fence. The left hand trail, going north, bore off from the main trail, keeping near the fence. Witness did not know whether that branch of the trail nearest the fence passed through the gap, or whether it passed on, up to the defendant's house. The body of the deceased, when witness saw it, lay near the right hand trail. The gun wadding which witness saw on the ground was on a line between the body and the point where, according to McGuire, the defendant stood when he fired the fatal shot. Witness saw an ax lying on the ground near the feet of the deceased. A fence some six or seven rails high led off south from the gap.

Bailey Nabors testified, for the State, that he was on the fatal scene, a short time after the homicide occurred. He looked for and found tracks, which seemed to be going north in the path running north, with the west line of the fence, towards defendant's house. Considerable sumac brush grew on both sides of that fence. Witness found where an ax had been stuck into the ground, and it was his opinion that the impression of the ax was made there before the footsteps reached the forks of the path. The tracks described the path nearest the fence, which was the right hand. Witness could not trace the tracks to the point where the body lay. Witness was unable to say whether or not the path passed through the gap.

Jeff. Graves testified, for the State, that on Monday, the day before the homicide, the defendant asked of him the loan of a pistol. Witness replied that his pistol was not at home. Defendant then told him to get it home, as he was liable to come for it any night.

J. W. Green, a witness for the State, described the wounds on the body as they were described by a previous witness, and stated that they ranged upward; those which passed out of the body passing out about two inches higher up than they went in.

M. V. Fleming testified, for the State, that he was one of the coroner's jury before whom the inquest was held. He testified as did previous witnesses as to the condition of the body, and stated further that he found a small six-shooting pistol on the body of the deceased. One chamber had been long discharged; the other five were loaded. The pistol was stuck in between the pants and drawers, entirely below the waist-band of the pants. Witness turned that pistol over to some one who was present, and had not seen it since, nor did he know what had become of it. The deceased was a large man, and would weigh one hundred and seventy-five or one hundred and eighty pounds. The coat exhibited was the coat worn by the deceased when witness saw the body.

William Masters was the first witness introduced by the defense. He testified that, on the evening of Monday, the day before the killing, Tom Rolla came to his house and requested him to go to defendant's house on the next morning for the purpose of moving and repairing a fence. After breakfast on the following morning, which witness had about 7 o'clock, the witness saddled his horse and started to the defendant's house, but before he got there he met McGuire, who told him of the killing. Witness rode on to defendant's house, and found Tom Rolla there, but defendant had already gone to Comanche. McGuire soon arrived with his wife, and then witness, McGuire and Rolla went to the body. The body lay about one hundred and fifty yards south from the defendant's house, west of the fence, and near the gap. The body lay on the defendant's land, about seventy-five yards from Mrs. Farmer's fence. Witness did not remain long at the body this time, but went first to Mrs. Farmer's to report the death of Harris to her, and thence to O'Brien's house, remained there until O'Brien hitched his team, and then returned to the body; by which time several parties had reached the ground.

The witness made an examination of the ground about the body. The deceased lay west of and about twenty-four feet distant from the gap. Witness found tracks in the path which followed the fence on the west side, which tracks appeared to come around the wire fence, from the direction of Mrs. Farmer's house, going north towards defendant's house. The path mentioned forked about twenty steps from the wire fence. The witness saw where an ax had been stuck into the ground on the path, and noticed that the distances between the tracks were shorter at that point than elsewhere, but he was unable to say that the party who made those tracks stopped there. That point was just opposite the gap in the east string of the fence through which the wagon passed. Witness ascertained by experiment that, by stooping at that point, he could see the gap in the east string of the fence. The path forked near the point where the ax had been stuck into the ground, but witness could not now recollect whether north or south of that point. The tracks followed the left hand path, some fifteen or twenty steps, and disappeared. The body lay between the two forks of the path, about thirty or forty feet from where the tracks disappeared. The two branches of the path were about forty feet apart at the point where the body lay. The ground was brushy between the two paths, the bushes being taller and thicker south than north of the body. Witness saw gun wadding on the ground, which was on a line with the body and the center of the gap. The distance between

the gap and the farthest piece of gun wadding was twenty-four feet, and the feet of the body lay four feet beyond that piece of wadding from the ·gap. An ax lay on the ground near the body. Witness examined the ground about the south post of· the gap. Some small bushes, perhaps two feet high, grew near the south post. A six or seven rail fence joined the south post. Witness knew John Harris in his life-time, and his reputation for peace or violence. He was regarded as a determined man, and one who might reasonably be expected to execute a threat.

W. F. Holcomb testified, for the defense, that since February, 1885, he had examined the ground about the south post of the gap in the fence referred to by previous witnesses. Some small but no large bushes grew about the post. Witness examined to see if any bushes had been cut away, but found only the stump of one bush, which was no larger around than his finger.

William Ham testified, for the defense, that he and the defendant had an engagement to go to the town of Comanche on the day of the homicide to settle a money transaction. When witness reached defendant's house on that morning he found that Harris had been killed, and defendant had gone to town. About two weeks before the homicide witness met the deceased between Lee's pasture and Herring's field, on the road to Comanche. Deceased had a club in his hand which was about as large in diameter as a chair post. Witness saw but about a foot and a half of it, and could not say how long it was as a whole.

Mrs. Lulu Helm, the wife of the defendant, testified that on the morning of the homicide defendant, McGuire and Rolla hitched the defendant's horses to his wagon, and Rolla and McGuire started off to move and repair a fence for the defendant. Defendant came into the house and remarked to witness: "Lulu, I am ready to churn for you now." Witness told him that the milk was not ready for churning. He then passed into an adjoining room, got his gun, and followed on after McGuire and Rolla. Defendant had been gone scarcely five minutes when the witness heard a voice call: "What are you doing there, you d—d son-of-a-b—h?" This remark was followed instantly by the report of a gun. Witness looked in the direction from which the voice and the report came, and saw the defendant leave the place where the gun was discharged and run towards the house. Witness fell upon the bed as soon as she discovered her husband running, and in less than a minute he was with her, and in reply to her question told her how the shooting occurred, and left almost immediately for Comanche to surrender.

On the morning before the homicide the defendant and Rolla went down to examine the fence which they were to move. When they presently returned, the defendant held a paper in his hand, which he gave to witness, saying that he found that paper at the fence he was going to move, and asked witness if she knew who wrote it. Witness examined it and identified the handwriting as that of the deceased. Witness knew his handwriting well. She had often seen him write while he was in the employ of and lived with the defendant. Witness identified the paper exhibited to her as the paper handed to her by the defendant with the declaration that he found it at the fence he was going to move. Witness knew the voice which she heard ask, "What are you doing here, you son-of-a-b—h?" to be the voice of the deceased. About two weeks before the homicide, the deceased, having a large stick in his hand, came to the defendant's house and looked over the fence into the yard; then he went to the crib and looked all about that, and left, going across the field. Defendant was not then at home, but witness told him of that occurrence on his return. Defendant and Rolla went to town on Monday, the day before the killing. When he came home that evening he left his slicker overcoat tied to his saddle out in the wagon. A slight rain came up that night, and he brought the saddle and coat from the wagon and put them on the gallery. When he started to town to surrender, after the killing, he took up his slicker, when a package fell out of his slicker pocket and bursted, scattering buck shot about. The package had not been opened since he got back from town on the night before. The defendant had long been in the habit of taking his gun with him when he went about his field. He rarely went from the house without it. Witness knew that the reputation of the deceased was that of a violent and dangerous man, and one who would most likely execute a threat. Witness had been shown and had examined the place of the killing, and knew that there were no stubs there to show that any bushes had been cut away since the killing. There was but one stub there, and that of a twig not larger than a finger. Witness had caused the fence to be removed since the killing, in order to get material to make a cow-pen. Deceased was killed on defendant's land.

Jim Wilson was the next witness for the defense. He testified that he had a conversation with the deceased about three weeks before the killing, at Cox's well. Deceased told witness in that conversation that the defendant was trying to get a bill against him for killing a hog, and that some of these days witness would hear of defendant getting the d——dest mauling out in the hackberries

that a man ever had. Witness shortly afterwards met deceased at Milner's fence, on which occasion he told the witness that, a day or two before, he saw the defendant going towards Comanche, and he thought the defendant was on his way to town to file a complaint against him for killing the hog. Under this impression, he said that he attempted to head the defendant off, and, to stop him, hallooed at him as he approached. That the defendant increased his speed and finally broke into a run, and that he attempted to get over a fence to follow, but a rail broke and threw him, and defendant escaped; and that but for such mishap he would have settled the matter with defendant, as he, being out rabbit hunting, had his gun with him. A few days later the deceased told witness that, defendant had been up to his aunt's house about the hogs, and that, if it were not for his aunt's people, he, deceased, would go to defendant's house, drag the defendant out and stamp h——ll out of him. Witness next encountered the deceased in the hackberries, about two weeks before the homicide. Witness was riding along the road in a lope, about dusk. He had penetrated the hackberries a short distance when the deceased stepped into the road from the roadside: and threw his gun down on witness. Witness checked up and drew his pistol, when deceased said: "You are not the man I want." Witness asked who he wanted, and deceased said: "Polk!" Witness asked: "Polk?" and deceased answered: "Yes, Polk Helm." Witness then told deceased not to make any more such plays on him. Witness reported all of these conversations to the defendant, and told him of the last encounter with deceased only a day or two before the homicide. The reputation of the deceased was that of a violent, dangerous man, and one who would most likely execute his threats.

The witness stated that he was examined as a witness upon the examining trial. He then testified to but one of the conversations detailed on this trial as having transpired between himself and deceased. Witness denied that, about the last of August, he stated in the presence of Sam Cox and Dave Martin that some one was going to be killed, and that defendant had told him that he and some one he did not name had watched two nights for Harris and failed to find him. Witness was related to defendant.

J. B. Mahaffey testified, for the defense, that he saw the defendant on the morning before the homicide. He helped the defendant put up a gap in the fence, working from about 9 o'clock until about 10, when the defendant left going towards his house. This witness described the ground about the place of the homicide substantially

as did the witness McGuire.   Deceased was killed on the defendant's land.   Deceased's reputation in the neighborhood was that of a dangerous, violent man, and one likely to execute his threats.

Tom McNutt testified, for the defense, that, one morning about three weeks before the homicide, the deceased came to where he was at work in a rock quarry, and asked if witness had seen the defendant going to Comanche.   Witness replied that he had not, when the deceased said that he understood that the defendant was going to town on that morning, and that he was anxious to meet him on the road.   He then had in his hand a green mesquite stick between three and four feet long, and about two inches in diameter.   His manner was angry and excited, and when he left, which he did on making the remark quoted, he left in a lope, going towards town.   The deceased came again to where the witness was quarrying, on the evening before the killing, and said to witness: "I wish you would let your fence which joins Mrs. Farmer's fence stand until I can get time to fix her fence."   Witness replied that he would let his fence stand for the time being, but that the defendant was going to move his fence from its junction with Mrs. Farmer's on the next day.   Deceased replied: "He *can* move it, and he *may* move it, but, d—n his onery soul, he *shan't* move it."   He then whirled his horse suddenly, and rode off rapidly towards Mrs. Farmer's house.   Witness told the defendant about the conversations with the deceased.   It was agreed that Jake Hodge was present at each of the conversations detailed by the witness McNutt, and that, if present and on the stand, he would testify to precisely the same facts.

John Sullivan testified, for the defense, that the deceased came to him on the evening before his death to borrow a pistol, saying that he was going on a visit to Fort Worth.   Witness loaned him his six-shooter; one of the chambers then being empty.   The pistol was returned to the witness after the examining trial.

G. A. Beeman testified, for the defense, that he went to the defendant's house about 10 o'clock on Monday, the day before the homicide, and left after dinner.   Defendant was at home when witness got there, and was there until witness left, and was left there by witness.

Justice of the Peace Milton Brown testified, for the defense, that the defendant and Rolla were in his office on the evening of Monday, the day before the homicide.   After they had been there some little time, Deputy Sheriff Huse came in, and something was said about defendant wanting to put the deceased under a peace bond.   Witness remarked that he did not want any man to swear before

him that he was afraid of another. Rolla had gone out when this remark was made by witness. After Huse and defendant went out witness stepped to the door of his office and saw Huse, defendant and Rolla standing by some machinery, talking. The defendant, with whom witness was not on very friendly terms, never spoke to witness about a peace bond. The defense closed.

The State, in rebuttal, introduced J. W. Milner, who testified that he had often seen the deceased write. He and deceased once worked together, digging a well. Deceased would work in the well awhile, and then witness awhile. They communicated with each other by notes, passing them backwards and forwards. They passed several notes in that manner. Witness had also seen deceased writing letters to his relatives in Alabama and Mississippi. Deceased wrote a large but indifferent hand. Witness did not think the note recognized by Mrs. Helm was in the handwriting of the deceased. Witness was himself but an indifferent pensman, and had no experience as an accountant. The letter M, in the note in evidence, was not such an M as deceased usually made.

Miss Harris, the sister of the deceased, testified for the State, in rebuttal, that she learned to write under the direction of the deceased. Neither she nor deceased could write good hands. She examined the note in evidence at great length, and said that she did not think it was written by the deceased. Deceased had been about his family but little during the last four years.

Newt. Martin testified that on one occasion in August, 1884, Jim Wilson told him that a man would soon be killed; that Helm and Harris were at outs, and Helm had told him, Wilson, that he and a man whose name he did not mention watched two nights for Harris, but failed to get him. Witness and Jim Wilson were friends. When Wilson was called in rebuttal by the defense, he denied the statement of Newt. Martin, declared that he had never made such statement, and had never heard the defendant say any such thing. He and Newt. Martin were not friendly.

J. C. Huse testified, for the defense, that he saw the defendant and Rolla on the evening before the homicide occurred. Defendant asked witness what steps he should take to get a man under a peace bond. Witness referred him to Squire Brown. Witness, however, examined the statute and told him the requisites of the necessary oath, and defendant replied that he could make the affidavit. Witness sent Rolla to Brown's office, and, defendant speaking to witness about it again, he went to Brown himself. Brown said that he didn't want a man to swear before him that he was afraid of another man.

Witness reported to defendant what Brown said, and he, defendant, and Rolla went off down the street.

The affidavits in support of the motion for new trial, referred to in the opinion of the court, read as follows:

"The State of Texas, ⎰
   " County of Comanche. ⎱

"Personally appeared before me, the undersigned authority, Thomas Rawley, who upon his oath says that he was with U. P. Helm on the evening before the killing, and saw him when he picked up a written paper, and which threatened him in the event he moved his fence, and believed the same to be that of the deceased, John Harris. Affiant further says that he saw Helm when he started to drive the hogs up to the gap where the killing occurred, and that he saw him for some thirty steps after he left affiant and Jes. McGuire, and that he had his gun down in his right hand, and was pushing an old sow along with it. Affiant further says that when he and McGuire got to the gap where Helm was standing, and where the killing occurred, that Helm was standing in or opposite the gap, and that he was in an erect position, and to the best of affiant's knowledge that the butt of his gun was resting on the ground. Affiant says that the voice which said: 'What are you doing here, you d—d son-of-a-b—h?' was not that of the defendant U. P. Helm; that he knew his voice well. Affiant says that several men were invited to Helm's on the morning of the killing, to assist in putting up and repairing the fence.

             (Signed)                          "Tom Rawley."
   "Subscribed and sworn to before me, this the 5th day of September, 1885.

      [L. s.]                         "M. W. Carroll,
                                        "Clerk D. C. C. C."

"The State of Texas, ⎰
   " County of Comanche. ⎱

   "Personally appeared before the undersigned authority Thomas Rawley, who upon his oath says that the conversation alluded to by one —— Fannin, in his testimony on the trial of U. P. Helm for murder, in which he said that he heard affiant and Helm talking on the evening before the killing of deceased by Helm, and that affiant said to Helm: 'The next time you make a pass at him, don't make a flash of it,' and that Helm said: 'No, the next time I make a pass at him I will kill him,' had no reference whatever to the deceased, but, upon the contrary, we were talking about a cow that had been getting into the field of Helm. Affiant says that on the

night before the conversation in question, that the defendant Helm went out into the field to kill her, but shot his gun off into the air, and that when affiant said not to make another flash, he had reference to shooting his gun in the air and nothing else, and that Helm so understood him.

(Signed) . . "TOM RAWLEY."

"Subscribed and sworn to before me this 5th day of September, 1885.

[L. S.]                           "M. W. CARROLL, .
                                  "Clerk D. C. C. C., Texas."

The motion for new trial raised the questions discussed in the opinion.

*Lindsey & Jenkins*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.   One of appellant's grounds in his motion for a new trial in the lower court was that since his trial and conviction the State had dismissed her prosecution by separate indictment against one Thomas Rolla, charged as an accessory or accomplice to this same identical murder, whose testimony, though material to his defense, could not be availed of by defendant on his trial on account of the said prosecution being at the time pending against said witness.

Under our statute, " persons charged as principals, accomplices or accessories, whether in the same indictment or by different indictments, cannot be introduced as witnesses for one another, but they may claim a severance; and if any one or more be acquitted, or the prosecution be dismissed, they may testify in behalf of the others." (Code Crim. Proc., art. 731; Penal Code, art. 91.)

Where an accomplice, etc., is acquitted or the prosecution against him is dismissed after his principal has been tried and convicted, a new trial will be granted the latter to obtain the testimony of the former, where it appears that the new evidence is legal and competent, and material to his defense.   Such testimony is called newly-discovered, though it is not such technically.   (See the whole subject fully discussed and the authorities cited in *Rucker* v. *The State*, 7 Texas Ct. App., 549.)

In support of this ground of his motion appellant filed the affidavit of the witness Rolla (or Rawley), and from his affidavit it appears that his testimony is competent,— admissible,— is corroborated

by other testimony in the case,— is most important in its explana-
tion of inculpatory facts against appellant; — in a word, is most
material,— is not improbable as to its truth, and may affect the re-
sult of the case upon another trial. (The reporter will give the affi-
davits of the witness in the report of the case.)

Because the court should have granted a new trial on account of
this newly-discovered evidence, and erred in overruling it, the judg-
ment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered December 9, 1885.]